United States Court of Appeals
For the Eighth Circuit
_____

No. 24-1614
_____

Tom Conley; Conley Group, Inc.

*Plaintiffs - Appellants*

v.

City of West Des Moines; Cherry Renee Hardman, Matthew McKinney, Kevin Trevillyan, Greg Hudson, Russ Trimble, in their individual and official capacities

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: January 16, 2025
Filed: November 3, 2025
_____

Before LOKEN, SHEPHERD, and KELLY, Circuit Judges.
_____

LOKEN, Circuit Judge.

Tom Conley, a former law enforcement officer, is the president, chief executive officer, and sole shareholder of The Conley Group, Inc. ("TCG"), a professional security services company operating throughout central Iowa since 1977. In December 2019, the City of West Des Moines ("the City") contracted with TCG to continue providing security services until the end of 2021. In 2020, TCG contracted

with the City of Des Moines ("Des Moines") to provide security at its city hall and municipal buildings.

In January 2021, Conley wrote a letter to the editor of *The Des Moines Register* criticizing a series of articles he viewed as unfairly critical of local law enforcement response to riots that followed the murder of George Floyd. The paper subsequently ran a series of stories on Conley, quoting emails and social media posts in which he criticized rioters and the Black Lives Matter movement. At a meeting on July 20, City Councilwoman Cherry "Renee" Hardman expressed concern with Conley's comments reported by *The Des Moines Register* and his personal values. On August 16, the City Council voted unanimously to terminate TCG's security services contract, which was due for renewal at the end of 2021. Hardman later asked the Des Moines City Manager when he was going to "get rid of Conley," and negative media stories about Conley continued to circulate. TCG, in the process of selling a portion of its security business, voluntarily terminated its contract with Des Moines to avoid detrimental impact on the transaction.

Conley and TCG filed this action in the Southern District of Iowa against the City of West Des Moines, Hardman, and the four other City Council members who voted to terminate the City's contract with TCG. The Amended Complaint, dated April 25, 2023, asserts three tort claims: Defendants engaged in unconstitutional retaliation when they cancelled the West Des Moines contract in response to Conley's exercise of his First Amendment rights (Count I); Defendants tortiously interfered with TCG's business contracts by pressuring Des Moines to cancel its contract with TCG (Count II); and Defendants defamed Conley by making statements that branded him a racist (Count III).

In a March 2024 order, the district court granted Defendants' Rule 12(b)(6) motion to dismiss each count for failure to state a claim. Regarding Count I, the court applied the well-established shareholder standing rule, see, e.g., Potthoff v. Morin,

Appellate Case: 24-1614    Page: 2    Date Filed: 11/03/2025 Entry ID: 5574086

245 F.3d 710 (8th Cir. 2001), concluding that shareholder Conley lacks standing to assert a First Amendment retaliation damage claim for injuries to TCG caused by cancellation of its contract with the City because Conley "has suffered no personal injury as required by Article III." The court dismissed TCG's claim for failure to state a First Amendment retaliation claim because the only speech allegedly subject to retaliation was made by Conley, not by the corporation. The court dismissed Count II because it only alleged one fact suggesting tortious interference, Hardman's communication with the Des Moines City Manager, and because Conley voluntarily terminated TCG's contract with Des Moines. The court dismissed Count III because the Amended Complaint did not identify any statements by Defendants, and mere implications from Defendants' actions cannot be the basis for a defamation claim.

Conley and TCG appeal the dismissal of their First Amendment retaliation and tortious interference claims. Part of their argument is that Conley "had standing to bring a claim for First Amendment retaliation" because he "suffered defamation damages independently of those suffered by" TCG. That does not properly preserve an appeal from the dismissal of Count III, see F.R.A.P. 28(a)(5), but the parties have briefed and argued that issue so it is properly before us by consent.

A recurring question raised by this appeal is whether a corporation's sole shareholder has standing to recover breach of contract, tortious interference, or defamation damages from a city and its officials who terminated or caused the termination of the corporation's municipal contracts because of the shareholder's political opinions and views. We review Rule 12(b)(6) dismissals for failure to state a claim *de novo*, "accepting as true all factual allegations and viewing them in the light most favorable to the non-moving party." Yang v. Robert Half Int'l, Inc., 79 F.4th 949, 961-62 (8th Cir. 2023). In Potthoff, we held that the sole shareholder's claim "can survive only if he has alleged that he personally has suffered a direct, nonderivative injury." 245 F.3d at 717 (citation omitted). Based upon "careful *de novo* review," id. at 716, and applying the above-quoted standard of review in Yang,

-3-

we affirmed dismissal of the shareholder's claim because "the record does not reflect any cognizable injury to Potthoff that is distinct from the harm suffered by [his corporation]." Id. at 718.

The district court applied this standard of review in dismissing Conley's § 1983 First Amendment retaliation claim. On appeal, neither party argues for a different standard of review. Therefore, like the district court, the facts we will discuss "are drawn from the Amended Complaint." We affirm the dismissal of Conley's First Amendment retaliation claim and the Count III defamation claims but modify the dismissals to be without prejudice. We reverse the dismissal of TCG's retaliation and tortious interference claims and remand for further proceedings.

## I. Background

In their Amended Complaint, Conley and TCG allege the following facts, which we accept as true in reviewing the Rule 12(b)(6) dismissals. Conley's letter to the editor of *The Des Moines Register* criticized its coverage of law enforcement responses to riots and protests that followed the murder of George Floyd in the summer of 2020. Conley viewed many news articles as "hit pieces" on law enforcement, and his letter called on the public to support local police. Responding to this criticism, *The Des Moines Register* published articles on TCG's work with local governments and Conley's critical comments about protestors. A front-page story on July 10, 2021, referenced social media posts and emails in which Conley likened the actions of the protestors to "terrorism," referred to the protestors as "thugs" and "snotnosed, punk$$ed, basement dwellers," and described local Black Lives Matter activists as "nothing but weak, punk***ed little sissy b****** who live in their parents basement."

At the July 20 meeting with Council Member Hardman and the City Attorney, the Amended Complaint alleges that Hardman said "she had some concerns about

-4-

Conley's comments as reported in the Des Moines Register and that she was on the fence about whether she would support Conley's contract with the City." When Hardman asked Conley his views on Black Lives Matter (BLM), Conley said he believed in the right to engage in free speech and peaceful assembly but opposed criminal activity committed in the name of BLM. He said a group of rioters had repeatedly thrown bricks and rocks at him, causing injury:

> After several weeks of rioting, two [Caucasian] members of the group approached Conley peacefully and apologized to him, stating they thought he was a police officer, not a security officer. They told Conley that they had been hired by BLM and traveled from Ohio to Des Moines to "raise Hell," that is to intimidate people and damage property. Both individuals said they were being paid by the hour and had been paid all their expenses for travel, food, and lodging.

"[V]isibly angry . . . Hardman then spoke at length about BLM and the hardships the black community had faced and continued to face. Hardman suggested Conley should do more research about BLM." During the meeting, Hardman also said that in her experience "the security officers provided by [TCG] were all very kind and professional."

Soon after this meeting, Conley learned that cancellation of TCG's security contract was placed on the agenda of the next City Council meeting. Conley's attorney protested and the status of TCG's contract was rescheduled to the following Council meeting on August 16. The Amended Complaint alleges that, on Friday August 13, the Council held a closed session, allegedly contrary to Iowa Code § 21.5(1)(c), at which Hardman "could be heard yelling angrily at the others present." At the August 16 meeting, the Council voted unanimously to cancel the TCG contract. "The meeting was attended by several BLM members who celebrated afterwards outside of City Hall." Following the meeting, Hardman sent a text message to a supporter stating she had used "every ounce" of her political capital "to

Appellate Case: 24-1614    Page: 5    Date Filed: 11/03/2025 Entry ID: 5574086

garner this 5-0 vote." "We will get sued -- but we have decided it is a fight worth fighting." The Amended Complaint alleges that this text message exchange "revealed [Hardman] had imposed her will on her fellow counsel members and that she recognized the cancellation of the Conley contract was illegal."

The Amended Complaint alleges that, after the cancellation, Hardman met the Des Moines city manager Scott Sanders at a municipal leaders event:

> Hardman asked Sanders a question to the effect of "when are you going to get rid of Conley too?" Hardman, directly and through proxies, engaged in communications with City of Des Moines council members to demand that they cancel [TCG's] contract with the City of Des Moines because of Conley's speech and beliefs.

There were also "several stories in the Des Moines Register on the topic of when the City of Des Moines would follow suit and cancel its contract with [TCG]." Seeing this as a threat to Conley's on-going attempt to sell "the regular security portion" of TCG, "Conley agreed with the City of Des Moines to end his security contract before it would have ended by its own terms."

## II. Discussion

**A. Shareholder Conley's First Amendment Retaliation Claim.** Invoking the "shareholder standing rule" we applied in Pothoff, the district court dismissed this claim because TCG CEO and sole shareholder Conley lacks standing to bring a First Amendment retaliation claim because he suffered no personal injury. The "irreducible constitutional minimum" of standing requires plaintiff to show he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). In addition, the Supreme Court

Appellate Case: 24-1614     Page: 6     Date Filed: 11/03/2025 Entry ID: 5574086

has recognized "prudential limitations" on the exercise of federal court jurisdiction. "[S]tanding imports justiciability," and "an aspect of justiciability"

> is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. . . . A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered some threatened or actual injury resulting from the putatively illegal action. . . . [T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.

Warth v. Seldin, 422 U.S. 490, 498-99 (1975) (emphasis in original; citations and quotations omitted).

The shareholder standing rule is one of "the prudential requirements of the standing doctrine." Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd., 493 U.S. 331, 336 (1990). As the Court explained, the rule is

> a longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment. . . . There is, however, an exception to this rule allowing a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated. Id.

The justification for the shareholder standing rule was well-summarized by Second Circuit Judge Thomas Swan in an oft-cited case, Green v. Victor Talking Mach. Co., 24 F.2d 378, 380-82 (2d Cir. 1928):

-7-

Appellate Case: 24-1614     Page: 7     Date Filed: 11/03/2025 Entry ID: 5574086

> The shareholders' rights are derivative, and, except through the corporation, the shareholders have no relation with one who commits a tort against the corporation's rights. . . . When there are numerous shareholders . . . [o]bviously it is sound policy to require a single action to be brought by the corporation, rather than to permit separate suits by each shareholder. . . . Even when all the stock is owned by a sole shareholder, there seems no adequate reason to depart from the general rule that the corporation and its shareholders are to be treated as distinct legal persons. . . . Only his "corporate rights" have been invaded, and consequently he cannot sue the tort-feasor in an action at law. . . . Assuming that the allegations of the complaint are adequate to charge that the defendant's motive . . . was a malicious desire to damage plaintiff as a shareholder, the cause of action is still the corporation's.
>
> \* \* \* \* \*
>
> For a shareholder to obtain a personal right of action there must be relations between him and the tort-feasor independent of those which the shareholder derives through his interest in the corporate assets and business.
>
> \* \* \* \* \*
>
> If it be assumed that the allegations of the complaint are sufficient to charge a contractual duty owing by defendant to [the corporation] . . . nevertheless a breach of that duty would give a right of action to the corporation, not to its shareholders. Nor can it be maintained that one who breaks a contract with a corporation commits a tort upon its shareholders.

As the district court recognized, in a long line of cases dating back at least to <u>Brictson v. Woodrough</u>, 164 F.2d 107 (8th Cir. 1947), we have adopted and applied this shareholder rule. See <u>Potthoff</u>, 254 F.3d at 716-18 and cases cited; <u>In re AFY, Inc.</u>, 902 F.3d 884, 890 (8th Cir. 2018) ("Because a corporation is an entity separate and distinct from its shareholders, a shareholder does not have standing to assert a claim

-8-

for harm suffered by the corporation."). Likewise, the Supreme Court of Iowa has adopted this general rule. See, e.g., Cunningham v. Kartridg Pak Co., 332 N.W.2d 881, 883 (Iowa 1983) ("The fact that a stockholder owns all, or practically all, or a majority of the stock, does not itself authorize him to sue as an individual.").

In Potthoff, a company entered into an agreement for the exclusive right to lease office space in a plaza owned by the City of St. Paul's Port Authority. Potthoff, the company's sole shareholder, was quoted in a local newspaper criticizing the mayor. The Port Authority's manager warned that the company's contract would be terminated if Potthoff did not retract his criticism. Potthoff refused to do so, and the contract was terminated. 245 F.3d at 712-13. Potthoff and his company brought an action in state court. Defendants removed because Count II was a 42 U.S.C. § 1983 claim alleging violation of shareholder Potthoff's free speech and due process rights. The district court dismissed Count II for lack of standing because Potthoff, the only one asserting a § 1983 claim, did not allege a separate and independent injury; the court declined to exercise supplemental jurisdiction over the state law claims. Potthoff, 245 F.3d at 714. On appeal, we applied the shareholder standing rule and affirmed the dismissal of Count II.[1] "When Potthoff incorporated [his company], he relinquished the right to seek direct legal redress under § 1983 for injuries suffered by him as [the company's] sole shareholder and principal employee." Id. at 717. Though the ultimatum to retract his political criticism was directed at Potthoff individually, he suffered "no cognizable injury . . . distinct from the harm suffered by [the company]." Id. at 717-18.

Like the sole shareholder plaintiff in Potthoff, Conley seeks § 1983 damages for the Defendants' alleged retaliation against TCG for Conley's exercise of his First

---

[1]Although the opinion refers to both "Plaintiffs," the panel did not address whether the company had standing to assert a First Amendment retaliation claim that the district court ruled had not been asserted.

Appellate Case: 24-1614     Page: 9     Date Filed: 11/03/2025 Entry ID: 5574086

Amendment right to publish his own political opinions and point of view. The district court dismissed this claim for lack of standing (no personal injury), relying on the shareholder standing rule as we applied it in Potthoff. On appeal, Conley argues our decision in Pothoff is not controlling for two distinct reasons.

**1.** First, Conley argues, as he did in the district court and as the plaintiff did in Potthoff, that the district court's ruling that he lacks standing because all the resulting damage was done to TCG "is in direct contradiction to the ruling of the United States Supreme Court in O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712 (1996)." In O'Hare, a towing company was removed from the city's list of available towing service providers when the company's owner refused to contribute to the mayor's reelection campaign. Id. at 715. The company and its owner sued the city under § 1983, alleging violation of the principle that the First Amendment severely limits government termination of a public employee based on party affiliation or political beliefs. Id. at 716.

The Court granted certiorari to decide whether the same protections "extend to an independent contractor, who, in retaliation for refusing to comply with demands for political support, has a government contract terminated or is removed from an official list of contractors authorized to perform public services." Id. at 714. The Court assumed, as the complaint alleged, "that the removal was in retaliation for [the owner's] stance in [the mayoral] campaign" (refusing to contribute to the mayor's campaign and supporting his opponent). Id. at 716. The Court reversed dismissal of the plaintiffs' claims for failing to state a claim, holding that independent contractors should be afforded the same First Amendment protections as public employees. Id. at 725-26. Without distinguishing between the claims of the company and the owner, the Court stated that "Petitioners . . . allege a loss of substantial income due to their termination." Id. at 723. Standing was not otherwise discussed.

-10-

Seizing upon references in the opinion to the owner and the company as "O'Hare," Conley asserts that the Court implicitly recognized that both company and owner "were contractors" who had standing to bring a First Amendment retaliation claim. As the district court recognized, we rejected the same argument in Potthoff:

> The issue before the Supreme Court [in O'Hare] was whether certain First Amendment protections afforded public employees extended to "independent contractors" (not whether [the owner] had standing to sue on behalf of [the company]). The distinction between the company and its owner-operator for purposes of applying standing rules was neither raised nor discussed. Indeed, the Supreme Court at times simply referred to petitioners together as "O'Hare."

245 F.3d at 717 n.6 (citation omitted). Conley argues "[t]hat distinction does not apply here, as both the corporation and the owner have brought suit, as in O'Hare." True, the corporation and its sole shareholder were both plaintiffs in Potthoff. But the district court determined that only the shareholder, who lacked standing under the shareholder standing rule, had asserted § 1983 claims, and we affirmed that ruling. Whether the corporation would have had a First Amendment retaliation claim was not at issue, and the district court declined to exercise supplemental jurisdiction over other claims the corporation did assert. Thus, our interpretation of O'Hare in Pothoff applies to this case. Even if not controlling precedent on this issue, we stand by that interpretation. The district court did not err in rejecting Conley's first argument that he does not lack standing to assert the First Amendment retaliation claim.

**2.** Conley's second argument is that he has standing to bring a First Amendment retaliation claim because he suffered defamation damages independent of those suffered by TCG. The district court did not discuss this contention, instead ruling that the Amended Complaint failed to state a claim for defamation in Count III. Defendants' brief on appeal does not even acknowledge this as a separate reason the

-11-

shareholder standing rule might not bar Conley's Count I First Amendment claim. Neither the Amended Complaint nor Plaintiffs' Resistance to Defendants' Motion to Dismiss clearly alleged or argued that Conley's alleged defamation damages gave him standing to assert a personal Count I claim that avoids the sole shareholder rule. We therefore decline to consider this argument first raised on appeal. But we note that, if properly pleaded, it is not a frivolous contention.

A sole shareholder's § 1983 claim "can survive only if he has alleged that he personally has suffered a direct, nonderivative injury." Potthoff, 245 F.3d at 717; see Franchise Tax Board, 493 U.S. at 336 ("[A] shareholder with a direct personal interest in a cause of action [may] bring suit even if the corporation's rights are also implicated."). The Supreme Court of Iowa also applies "a well-recognized exception to the general rule: a shareholder has an individual cause of action if the harm to the corporation also damaged the shareholder in his capacity as an individual rather than as a shareholder." Cunningham, 332 N.W. 2d at 883.

Claims of "loss of reputation" are personal to the shareholder unless the losses "were merely consequential to those suffered by the corporation[]." Taha v. Engstrand, 987 F.2d 505, 507 (8th Cir. 1993). Defamation of a shareholder can cause loss of reputation. But is that loss of reputation personal to the shareholder? If the loss is consequential to the corporation's loss, such as a loss of business or the value of corporate stock or assets -- the sole shareholder rule applies. But what if the defamation is maliciously aimed at the shareholder's livelihood because of his political opinions or beliefs? Should the shareholder have standing to seek damages for this broader loss that is personal to him? Logic would say yes, but the issue wasn't pleaded, briefed, or argued and may never have been seriously analyzed by an appellate court. So we leave it for another day.

Appellate Case: 24-1614    Page: 12    Date Filed: 11/03/2025 Entry ID: 5574086

We note, however, that the Amended Complaint alleges *The Des Moines Register* published a series of articles smearing Conley's professional reputation because his public speaking reflected political opinions and views the newspaper's journalists did not agree with. Council member Hardman then allegedly used "every ounce" of her political capital to get TCG's contract terminated and pressured Des Moines to do the same because she shared *The Des Moines Register*'s view of Conley's political speech. If there was proof of collaboration between Hardman and the newspaper, the inference of malice needed for a First Amendment claim in this context is apparent. Facts like these might support a textbook case of tortious interference or a prima facie tort. See Developments in the Law, Competitive Torts, 77 Harv. L. Rev. 888, 923-29 (1964); Tuttle v. Buck, 119 N.W. 946 (Minn. 1909). Thus, we modify the dismissal of this claim to be without prejudice.

**B. TCG's First Amendment Retaliation Claim.** The district court dismissed this claim for failure to state a claim because "[t]here are no averments that [TCG] made any speech that was allegedly subject to retaliation, only speech by Conley individually."[2] The court cited no case or secondary authority to support this ruling. On appeal, Defendants assert that "federal district courts within the Eighth Circuit have consistently applied the Potthoff ruling and barred retaliation claims by individuals on behalf of their companies." The only case that even arguably addressed this issue simply ruled, "there is no allegation nor evidence that [the company] itself -- as a corporate entity distinct from [the owner] -- engaged in protected speech for which it was retaliated against by Defendants." Driver v. Wood, 670 F. Supp. 3d 723, 732 (W.D. Ark. 2023). That case was either wrongly decided

---

[2]The district court did not address whether TCG has standing to assert this claim. Obviously, TCG suffered injury in fact. Both Conley and TCG asserted this § 1983 claim, like the plaintiffs in O'Hare. At least one of them had Article III and prudential standing. That is doubtless why the Supreme Court did not need to address standing in O'Hare.

-13-

or does not apply to a ruling on a motion to dismiss rather than a motion for summary judgment or after trial. At the motion-to-dismiss stage, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Neither the district court nor the Defendants take the position that a corporation cannot bring an action for First Amendment retaliation because a corporation does not "speak." Properly so. A corporation can only speak through its agents, and a CEO and sole shareholder such as Conley is obviously an authorized agent. Summoned to attend the July 20 meeting with Hardman and the City attorney, Conley defended TCG's performance under its contract with the City and urged that it be renewed at the end of the year. TCG under Conley's direction fought back when Hardman went on her crusade to have TCG's contracts with the City and Des Moines terminated.

The sole shareholder rule does not apply to "actions to enforce the rights of the corporation [if] the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment." In re AFY, 902 F.3d at 890, quoting Franchise Tax Board, 493 U.S. at 336. Here, Conley and TCG, management and the corporation, assert First Amendment retaliation claims on the same facts. In resisting Defendants' motion to dismiss, Plaintiffs urged the district court to designate the motion to dismiss as a motion for summary judgment under Rule 12(d). For the reasons stated in Part II.A. and properly reading the allegations in the Amended Complaint in the light most favorable to Conley and TCG, this was a sound request. The district court abused its discretion by granting the motion to dismiss without carefully explaining why it was declining the request. We reverse the dismissal of TCG's First Amendment retaliation claim at this stage of the proceedings.

-14-

**C. Tortious Interference.** TCG also appeals the dismissal of its claim for tortious interference with a business contract when Council Member Hardman "directly and through proxies, engaged in communications with City of Des Moines council members to demand that they cancel [TCG's] contract with the City of Des Moines because of Conley's speech and beliefs" and asked the Des Moines City Manager, "when are you going to get rid of Conley too?" To recover for tortious interference with a contract, a plaintiff must show: "(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted." Jones v. Univ. of Iowa, 836 N.W.2d 127, 151 (Iowa 2013), quoting Kern v. Palmer Coll. of Chiropractic, 757 N.W.2d 651, 662 (Iowa 2008).

The district court dismissed this claim because (i) the Amended Complaint only described a single factual circumstance supporting the claim -- Hardman's comment to the Des Moines City Manager; (ii) the other allegations are "naked assertions devoid of further factual enhancement," Iqbal, 556 U.S. at 678 (cleaned up); and (iii) Conley made the decision to terminate TCG's contract with Des Moines to avoid negative publicity "but the Amended Complaint does not allege how Defendants were responsible for this negative publicity." For the reasons stated in Part II.A., we conclude this is not a proper reading of the allegations in the Amended Complaint, viewed in the light most favorable to Conley and TCG at this stage of the proceedings. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.; see McDonough v. Anoka Cnty., 799 F.3d 931, 945 (8th Cir. 2015), cert. denied, 578 U.S. 1012 (2016). TCG alleged facts permitting the reasonable inference that one or more Defendants maliciously interfered with TCG's contractual relationship with Des Moines and caused the termination of that contract to punish Conley for his political views, forcing Conley to terminate the Des Moines contract to avoid

-15-

collateral damage to his enterprise and his livelihood. Factual development may fail to support this tortious interference theory, but the Rule 12(b)(6) dismissal was premature.

**D. Defamation.** Lastly, Conley appeals the dismissal of Count III, his defamation claim. To establish a prima facie case of defamation under Iowa law, the plaintiff must show the defendant "(1) published a statement that (2) was defamatory (3) of and concerning the plaintiff, and (4) resulted in injury to the plaintiff." Johnson v. Nickerson, 542 N.W.2d 506, 510 (Iowa 1996). In Count III, Conley alleges that Defendants "made statements directly and impliedly that Tom Conley was a racist, during City Council meetings, and in statements that were published to third parties, including the media, clients of Conley Security, individuals, and the public at large," and that these statements constituted defamation by implication and defamation per se. Defamation by implication requires a showing that defendant "(1) juxtapose[d] a series of facts so as to imply a defamatory connection between them, or (2) create[d] a defamatory implication by omitting facts." Stevens v. Iowa Newspapers, Inc., 728 N.W.2d 823, 827 (Iowa 2007); see Nunes v. Lizza, 12 F.4th 890 (8th Cir. 2021). Defamation per se is a statement that "has a natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse." Bandstra v. Covenant Reformed Church, 913 N.W.2d 19, 46 (Iowa 2018) (quotation omitted).

The district court dismissed Count III because it:

> sets forth the defamation claim in four short paragraphs. Crucially, it does not identify *any* statement made by Defendants, much less a series of facially nonlibelous statements which allow the audience to "connect the dots" to arrive at a defamatory implication. . . . The absence of any specific statement is inexplicable because Plaintiffs allege that "Defendants made statements *directly* . . . that Tom Conley was a

Appellate Case: 24-1614     Page: 16     Date Filed: 11/03/2025 Entry ID: 5574086

> racist." Plaintiffs' resistance . . . argues that "the clear implication of these unusual *actions* was that Tom Conley was a racist and needed to be punished." . . . Plaintiffs essentially seek to impose liability for defamation against Defendants based on their actions . . . . This is not a proper basis for a defamation claim.

(citations omitted; emphasis in original). After careful review of the Amended Complaint, we agree with the district court's analysis. Conley alleges Defendants made statements "directly and impliedly that [he] was a racist," but the only statements identified in the Amended Complaint are articles published by *The Des Moines Register*, and Conley chose not to sue the newspaper. We affirm the dismissal of Count III as it does not state a plausible claim for defamation per se or by implication. However, as we are remanding the case for further proceedings, we direct that the dismissal of Count III be without prejudice.

### III. Conclusion

For the foregoing reasons, we affirm the dismissal of Conley's claims for First Amendment retaliation (Count I) and defamation (Count III) but direct the district court to modify the dismissals to be without prejudice. We reverse the dismissal of TCG's claims for First Amendment retaliation (Count I) and tortious interference with contract (Count II), and remand for further proceedings not inconsistent with this opinion.

KELLY, Circuit Judge, concurring.

I concur in the court's opinion, but I would not modify the dismissals to be without prejudice. This relief was neither sought nor briefed, and I would not grant it on our own initiative.

_____